# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

———————————————

Nº 10-CV-2858 (JFB)

———————————————

STANLEY WILLIAMS,

Petitioner,

VERSUS

MARK BRADT,

Respondent.

———————————————

**MEMORANDUM AND ORDER**
July 17, 2012

———————————————

JOSEPH F. BIANCO, District Judge:

Stanley Williams ("petitioner") petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his conviction entered on May 31, 2006, in Suffolk County Criminal Court for murder in the second degree (N.Y. Penal Law § 125.25(3)), assault in the first degree (N.Y. Penal Law § 120.10(1)) and two counts of burglary in the first degree (N.Y. Penal Law § 140.30(2)). Petitioner was sentenced to (1) an indeterminate term of twenty-five years to life in prison for his conviction of murder in the second degree, (2) a determinate sentence of fifteen years in prison for his conviction of assault in the first degree to run consecutively with the sentence for second degree murder, with a period of five years' post-release supervision, and (3) two determinate sentences of fifteen years in prison for his conviction of two counts of burglary in the first degree to run concurrently with the sentence for first degree assault, with a period of five years' post-release supervision.

Petitioner challenges his conviction on the following grounds: (1) the evidence was insufficient to support a finding of guilt beyond a reasonable doubt; (2) ineffective assistance of counsel; and (3) the sentence imposed was harsh and excessive.

For the reasons set forth below, the Court finds that petitioner has not demonstrated any basis for habeas relief, and thus, the petition is denied in its entirety on the merits.

## I. BACKGROUND

### A. Facts

The following facts were adduced from the petition, as well as from the state court trial and appellate record.

On April 27, 2004, at around midnight, three masked individuals broke down the door to 32 Tamarack Street in Central Islip.[1] (Tr.[2] at 597, 600-01, 612.) Upon entering, the intruders grabbed Robert Arbaiza ("Arbaiza") and Katy Ventura ("Ventura") from the living room. (*Id*. at 600-03.) Arbaiza struggled with the intruder who held a knife in an attempt to disarm him. (*Id*. at 601-605.) During the struggle, Arbaiza was stabbed four times in the back and hit in the head with a baseball bat. (*Id*. at 604.) The intruders then dragged Arbaiza and forced Ventura into the upstairs bedroom where Monica Dudley ("Dudley"), Eric Shawn Carter ("Carter"), and Carter's infant child were located. (*Id*. at 605-07, 645-46, 670-72.) The intruders pointed a gun in Carter's face. (*Id.* at 605.) The intruders threatened to kill the infant and one of them began striking an area on the mattress next to where the infant was lying with a baseball bat. (*Id*. at 608.) In an attempt to protect his child, Carter tried to get up and fight back. (*Id.* at 608, 674-75.) Carter suffered four stab wounds to the side of his back, several wounds to his head, and multiple injuries to the shoulder and trunk areas of his body. (*Id*. at 851-52, 855-56.)

Minutes after the attack, a bleeding Arbaiza attempted twice to call 911. (*Id.* at 617.) On his second attempt, he was successful and reported a robbery and stabbing at 32 Tamarack Street. (*Id*.) At 1:03 a.m., Officers Franklin Abramowitz and John Connors responded to the call. (*Id*. at 498-99.) Carter was transported to the hospital and shortly thereafter died from his injuries. (*Id*. at 504.) Arbaiza spent three days in the hospital, but survived the attack. (*Id*. at 618.)

At 4:05 a.m., Detective Michael DeGennaro ("DeGennaro") from the crime scene identification section arrived to process the scene. (*Id*. at 518.) DeGennaro conducted a walk-through and then took a twelve-minute videotape of the crime scene. (*Id*. at 522.) Shortly thereafter, Peter Tracy ("Tracy"), a forensic scientist from the Medical Examiner's office conducted evidence recovery. (*Id*. at 561-62.) Tracy retrieved a blood-stained baseball cap from within the home and a glove in a yard one block east of 32 Tamarack Street. (*Id*. at 569-70.)

At the crime lab, Carter's DNA was compared to the DNA obtained from the blood-stained baseball cap. (*Id.* at 816, 831.) Laboratory analysis established that Carter's DNA matched the blood stains on the baseball cap. (*Id.* at 833.) The analysis further established that another person's DNA was present on the baseball cap. (*Id.* at 834.)

### 1. Tip from Marcus T. Glover

On December 28, 2004, investigators received a tip from Marcus T. Glover ("Glover"), concerning petitioner's involvement in a robbery and stabbing.[3] (PTR.[4] at 9-12.)

---

[1] In the parties' submissions, "32 Tamarack Street" is referred to in different ways, with slight variations to spelling and street title. For the purpose of this opinion, "32 Tamarack Street" is utilized.

[2] "Tr." refers to the transcript of petitioner's trial.

[3] Glover testified as a prosecution witness at trial while incarcerated for certain drug-related crimes. (Tr. at 729.)

[4] "PTR." refers to the transcript of petitioner's *Huntley/Dunaway* hearing.

Glover testified that, after the murder of Carter, petitioner told him that petitioner, along with Ronald Bryson ("Bryson"), William Brewster ("Brewster"), and Wanda Santalis ("Santalis"), went to commit a robbery of Carter, but that it did not turn out as planned. (Tr. at 732-35.) Glover informed investigators that petitioner told him there was a scuffle and that petitioner stabbed Carter. (*Id.* at 734.) Glover's tip was incorporated into a sworn statement and signed.[5] (PTR. at 10.)

2. Cooperation and Testimony of Santalis

On May 5, 2005, based on information obtained from Glover, investigators arrested Santalis. (Tr. at 688.) Santalis agreed to cooperate and testify truthfully against petitioner, Bryson, and Brewster.[6] (*Id.* at 697.) She testified that she was in a relationship with petitioner and that she had two children with him. (*Id.* at 687-689.)

Santalis testified that she had engaged in sexual intercourse with Carter four months before the murder occurred, and that she had given him $300 to help him out financially. (*Id.* at 691-93.) She also testified that she told petitioner about the money she gave to Carter. (*Id.* at 693.)

Santalis testified that, in April 2004, petitioner, Bryson, and Brewster decided to rob Carter; Santalis stated that she agreed to drive them. (*Id.* at 693-94, 698.)

Santalis testified that she dropped them off about one block away from 32 Tamarack Street and waited. (*Id.* at 701.) She stated that, after some time, the men ran back to the car, and petitioner said, "I caught a body" a few times. (*Id.* at 703-04, 706.) She also stated that petitioner told her that Carter would not let petitioner go, so petitioner stabbed him. (*Id.* at 704.)

3. Petitioner's Arrest

On May 5, 2005, at 8:03 a.m., uniformed police officers stopped a vehicle containing petitioner and arrested petitioner. (*Id.* at 750-51.) The arresting officers transported petitioner to the Brentwood Firehouse where detectives Douglas Mercer ("Mercer") and Vincent Stephan ("Stephan") were waiting. (*Id.* at 751-52.) Petitioner was handed over to the detectives and placed in the back of their unmarked car. (*Id.*)

The detectives told petitioner that he was under arrest for the murder of Carter and that he should "think about who he talked to about the murder in the last year." (*Id.* at 752-53.) There was no further discussion during the twenty-seven minute car ride to the Suffolk County Police Department homicide squad headquarters. (*Id.* at 753-54.) He was not read his *Miranda* rights in the vehicle.

4. Petitioner's Interrogation and Confession

At approximately 8:33 a.m., petitioner and the detectives arrived at headquarters. (*Id.* at 754.) Petitioner was placed in an interview room and was shackled to a ring in the floor. (*Id.* at 755.) At 8:57 a.m., petitioner was read his *Miranda* rights from a standard rights card, and petitioner signed the card and waived his rights. (*Id.* at 758-62.) Petitioner was interviewed for about thirty-two minutes and made certain oral

---

[5] At trial, Glover testified that he and petitioner grew up and went to school together. He also identified petitioner in the courtroom. (Tr. at 729-31.)

[6] After being charged with second degree murder, Santalis entered into a plea agreement and agreed to testify truthfully against petitioner, Bryson, and Brewster. In light of her cooperation, she was allowed to plead guilty to burglary in the first degree and received a sentence of seven years' imprisonment; she faced a sentence of twenty-five years to life in prison if she had gone to trial. (Tr. at 696, 698, 718.)

admissions about his involvement in the murder of Carter. (*Id*. at 763-66.)

At 9:55 a.m., petitioner again agreed to waive his rights and give a written confession. (*Id*. at 767-68.) The waiver form contained a statement of petitioner's right to refuse to waive his rights. (*Id*.) Petitioner told Mercer what to write in the confession. (*Id.* at 770.)

In his written confession petitioner stated, *inter alia*, that in April 2004, at around midnight, Santalis drove petitioner, Bryson, and Brewster to 32 Tamarack Street to commit a robbery of Carter.[7] (*Id*. at 774, 798.) Petitioner stated that, when he and the other defendants broke into the house, he held the baseball bat and Bryson held the knife, but at some point after the intrusion, they switched weapons. (*Id*. at 775-76.) Petitioner then stated that a fight ensued in which petitioner "hit" Carter a couple of times with a knife. (*Id*. at 776-77.) Petitioner stated that, the following day, he drove past 32 Tamarack Street and saw yellow police tape and learned from watching Channel 12 News that Carter had died. (*Id*. at 777-78.) The confession was read aloud to petitioner and he signed it without making any changes.[8] (*Id*. at 771.)

Petitioner was shown and asked to identify two photographs of the scene at 32 Tamarack Street and a photograph each of Bryson and Brewster. (*Id*. at 789-96.) Mercer testified that he showed petitioner such photos to make sure that petitioner was describing the same events and persons as petitioner was describing in his written confession. (*Id*. at 789.) On each

photograph, petitioner wrote a description on the back.

On the back of the photograph depicting the front lawn of 32 Tamarack Street, petitioner wrote "Eric house" [sic] and "where I went to get Wanda's money." (*Id*. at 790-93.) On the photograph depicting the broken front door to the house petitioner wrote "door that Ron broke." (*Id*. at 794.) Finally, petitioner wrote the names "Ronald Bryson" and "William Brewster" on the back of photos of each of them. (*Id*. at 795-96.) He signed and dated each photograph. At trial, all of these photographs were admitted into evidence.[9] (*Id*. at 790-96.) Following the written confession, petitioner agreed to allow investigators to take a DNA buccal swab from him. (*Id*. at 782-84.)

### 5. Testimony Regarding the DNA Analysis of Baseball Cap[10]

At trial, the crime lab supervisor, Joseph Galdi ("Galdi"), testified regarding the laboratory analysis of the blood-stained baseball cap and petitioner's DNA sample. (*Id*. at 821-34.) Galdi testified that he examined the items of evidence, identified the body fluids that were present, and collected samples that were ultimately tested for DNA. (*Id.* at 818.) Galdi testified that another forensic scientist, Robert Baumann ("Baumann"), performed the DNA analysis. (*Id.*) Galdi testified as to his qualifications

---

[7] In his statement, petitioner referred to Bryson as "Ramanadi." Petitioner confirmed to detectives that "Ramanadi" was the same person as Bryson. (Tr. at 798.)

[8] While testifying at trial, Mercer read the confession to the jury. (Tr. at 773-78.)

[9] Prior to trial, petitioner claimed that his confession was a result of physical coercion and that it should be suppressed. As discussed *infra*, the trial court held a hearing and found that the confession was voluntary and admissible. (Order of Suffolk County Criminal Court, dated December 14, 2005.) Petitioner testified at trial that he did not give the officers the information in the confession, and that he signed the confession because the officers hit, choked, and threatened him. (Tr. at 879-80, 888, 894-95.)

[10] Petitioner's trial counsel did not raise any objections to the admission of this testimony. (Tr. at 815.)

and his supervisory role in Baumann's analysis. (*Id*. at 818-20.) Galdi also gave the jury a broad overview of DNA analysis in general and how his crime lab generally conducts its analysis. (*Id*. at 820-21, 823.)

Galdi testified that four brown stains were observed on the baseball cap and two tested positive for blood (one stain under the brim and one on the outside of the headband). (*Id*. at 822, 828-30.) He testified that Baumann developed DNA profiles from the hat. (*Id*. at 831.) Based on these DNA profiles, Arbaiza, Dudley, Bryson, and Brewster were excluded as sources of DNA on the baseball cap.[11] (*Id*. at 832-33.)

Galdi testified that the blood stain on the brim of the baseball cap had DNA from two people. (*Id*. at 833.) He testified that Baumann's analysis showed that Carter's blood matched the major component of the DNA on the brim of the baseball cap. (*Id*.) He further testified that Baumann's analysis established that petitioner's DNA did not match the DNA on the brim of the baseball cap, but that it did match the DNA found on the sweatband of the baseball cap. (*Id*. at 834.)

6. Evidence of the Height and Skin Tone of the Intruders

At trial, Arbaiza, Dudley, and Ventura testified that the intruder who stabbed Arbaiza and Carter was the shortest of the three intruders, and Arbaiza and Dudley testified that the intruder who stabbed Arbaiza and Carter had the darkest skin tone of all three intruders. (*Id*. at 621, 653-54, 676.)

Arbaiza testified that the person who stabbed him was the shortest and had the

---

[11] At trial, Arbaiza testified that the baseball cap did not belong to him or Carter. (*Id*. at 627-28.)

darkest skin tone of the three intruders. (*Id*. at 621.)

Ventura, who was sitting in the living room with Arbaiza watching television when the intruders broke in, testified that she believed the same person who stabbed Arbaiza stabbed Carter. (*Id*. at 652.) She also testified that the intruder who stabbed both men was the shortest of all three intruders. (*Id*. at 642-43, 651, 653.)

Dudley, who was upstairs in the bedroom with her children when the intruders broke in, testified that the intruder with the knife was shorter and had a darker skin tone than the other three intruders. (*Id*. at 670, 676-77.)

Mercer, one of the principal investigators on the case, testified about his opportunity to observe the relative heights and skin tones of petitioner, Bryson, and Brewster. (*Id*. at 800-01.) Mercer testified that it was his opinion that petitioner was the shortest of the three and that Brewster was the tallest. (*Id*. at 800.) Mercer also testified that he was of the opinion that petitioner had the darkest skin tone of the three and that Brewster had the lightest skin tone. (*Id*. at 801.)

B. Procedural History

1. State Court Proceedings

a. *Huntley/Dunaway* Hearing

On December 6, 2005, the Honorable Michael F. Mullen held a *Huntley/Dunaway* hearing to determine whether the written confession petitioner gave to Detective Mercer at the Suffolk County Police Department homicide squad headquarters should be suppressed. (PTR. at 1, 3.)

At the hearing, Mercer testified as to the events surrounding petitioner's arrest and

interrogation of May 5, 2005. (*Id*. at 18-44.) Mercer testified that petitioner voluntarily waived his rights and gave a confession. (*Id*. at 37-40.)

On December 14, 2005, the trial court denied petitioner's suppression motion and found the written confession to be admissible. The court held that petitioner's arrest was based on probable cause and that the government showed beyond a reasonable doubt that plaintiff was aware of his rights and knowingly and intelligently waived them. (Order of Suffolk County Criminal Court, dated December 14, 2005.)

b. Trial and Sentencing

On May 11, 2005, petitioner was indicted on one count of murder in the second degree in violation of Penal Law § 125.25(3), under a felony murder theory, one count of assault in the first degree in violation of Penal Law § 120.10(1), and two counts of burglary in the first degree in violation of Penal Law § 140.30(2).

The following details of petitioner's trial are relevant to the instant petition. First, during trial, the prosecution sought to offer the crime scene videotape into evidence. (Tr. at 524.) The trial judge gave defense counsel an opportunity to view the videotape during the lunch break. (*Id*. at 524-25.) After viewing the videotape, defense counsel raised no objection to its admission into evidence. (*Id*. at 528.) Second, after the prosecution and defense both rested, defense counsel requested a missing witness charge regarding Stephan who was not called as a witness by the prosecution. (*Id*. at 912.) The trial court denied the request because it was untimely. (*Id*. at 913.) Finally, during summation, defense counsel gave a shorter closing statement than the prosecution. (*Id.* at 914-18.)

On May 16, 2006, the jury found petitioner guilty on all four counts. (*Id*. at 1005-09.)

Petitioner was sentenced on May 31, 2006 to (1) an indeterminate term of twenty-five years to life in prison for his conviction of murder in the second degree, (2) a determinate sentence of fifteen years in prison for his conviction of assault in the first degree to run consecutively with the sentence for second degree murder, with a period of five years' post-release supervision, and (3) two determinate sentences of fifteen years in prison for his conviction of two counts of burglary in the first degree to run concurrently with the sentence for first degree assault, with a period of five years' post-release supervision, and the mandatory surcharge of $270.00. (S. at 14-15.[12])

c. Direct Appeal

Petitioner appealed his conviction to the New York Supreme Court, Appellate Division Second Department ("Appellate Division"), on the following grounds: (1) ineffective assistance of counsel because counsel (a) failed to object to the testimony of Galdi, the supervisor of the crime lab, regarding DNA analysis conducted in the crime lab by forensic scientist Baumann and failed to cross-examine Galdi; (b) failed to view the crime scene videotape prior to trial; (c) failed to give an adequate closing statement; and (d) failed to make a timely missing witness jury charge request regarding Stephan; (2) the evidence was insufficient to support a finding of guilt beyond a reasonable doubt and the conviction was against the weight of the evidence; and (3) the sentence imposed was

---

[12] "S." refers to the transcript of petitioner's sentencing.

harsh and excessive. (Deft.-Appellant Br. at 4, 20, 37, 40.)

On February 10, 2009, the Appellate Division affirmed the trial court's ruling. *People v. Williams*, 59 A.D.3d. 576 (N.Y. App. Div. 2009). The court held: (1) petitioner was not deprived the effective assistance of counsel, (2) the verdict of guilt was not against the weight of evidence, and (3) the sentence imposed was not excessive. *Id.*

Petitioner then filed an application with the New York Court of Appeals for leave to appeal the Appellate Division's order. His application raised the same claims as those raised before the Appellate Division. The New York Court of Appeals denied petitioner's application for leave to appeal on May 27, 2009. *People v Williams*, 909 N.E.2d 596 (N.Y. 2009).

2. The Instant Petition

Petitioner filed the instant habeas corpus petition on June 16, 2010. Respondent's memorandum of law in opposition to petitioner's petition for a writ of habeas corpus was filed on September 8, 2010. By letter dated October 7, 2012, petitioner requested additional time to respond to the respondent's memorandum or law and proposed a deadline of November 20, 2010. On May 4, 2011, the Court issued an Order noting that petitioner had not filed a reply by November 20, 2010, and directed petitioner to file his reply by June 1, 2011. By letter dated May 23, 2011, petitioner again requested additional time to reply to respondent's brief. On June 8, 2011, the Court granted petitioner's request and directed petitioner to file his reply by August 8, 2011. Petitioner has not filed his reply. The Court has fully considered the arguments and submissions of the parties.

II. STANDARD OF REVIEW

To determine whether petitioner is entitled to a writ of habeas corpus, a federal court must apply the standard of review set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which provides, in relevant part:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "'Clearly established Federal law'" is comprised of "'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

A decision is "contrary to" clearly established federal law, as determined by the Supreme Court, "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than

[the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* at 413.

AEDPA establishes a deferential standard of review: "'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.'" *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (quoting *Williams*, 529 U.S. at 411). The Second Circuit added that, while "'some increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.'" *Gilchrist*, 260 F.3d at 93 (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)). Finally, "if the federal claim was not adjudicated on the merits, 'AEDPA deference is not required, and conclusions of law and mixed findings of fact and conclusions of law are reviewed *de novo*.'" *Dolphy v. Mantello*, 552 F.3d 236, 238 (2d Cir. 2009) (quoting *Spears v. Greiner*, 459 F.3d 200, 203 (2d Cir. 2006)).

## III. DISCUSSION

For the reasons set forth below, the Court denies the relief sought by petitioner. Petitioner's argument that there was insufficient evidence to prove his guilt beyond a reasonable doubt fails on the merits. A jury, viewing the overwhelming evidence of guilt presented at trial in the light most favorable to the prosecution, could have rationally concluded beyond a reasonable doubt that petitioner committed murder in the second degree, assault in the first degree, and two counts of burglary in the first degree. Petitioner's claim that he was denied the effective assistance of counsel is also without merit because petitioner has failed to demonstrate that counsel's representation fell below an objective standard of reasonableness. Even assuming *arguendo* that petitioner's counsel did not meet this standard, petitioner has failed to demonstrate any prejudice from counsel's performance at trial. Petitioner's argument that his sentence was excessive is also without merit as the sentence was within the permitted range prescribed by state law. The Court addresses each claim in turn.

### A. Sufficiency of the Evidence Claim

Petitioner contends that the evidence presented at trial was legally insufficient to prove his guilt beyond a reasonable doubt.[13] However, as set forth below, the Court finds that petitioner's argument is without merit

---

[13] Respondent argues that a claim concerning the weight of evidence is a state law claim and not a basis for habeas review. (*See* Resp. Br. at 5.) To the extent petitioner raises a weight of the evidence claim in his petition, this Court agrees with respondent that the claim must fail. A "weight of the evidence" claim is based on state law. *See Correa v. Duncan*, 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001) ("A 'weight of the evidence' argument is a pure state law claim grounded in New York Criminal Procedure Law § 470.15(5), whereas a legal sufficiency claim is based on federal due process principles."). The Court cannot consider a purely state law claim on federal habeas review. *See Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S. Ct. 3092, 111 L. Ed. 2d 606 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law . . . "). Therefore, to the extent petitioner raises a claim that his conviction was against the weight of evidence, the Court cannot review it. However, even construed as a sufficiency claim, it is without merit, as discussed *infra*.

8

and he is not entitled to habeas relief on this ground.

### 1. Legal Standard

The law governing habeas relief from a state conviction based on insufficiency of the evidence is well established. A petitioner "bears a very heavy burden" when challenging the legal sufficiency of the evidence in an application for a writ of habeas corpus. *Einaugler v. Sup. Ct. of the State of N.Y.*, 109 F.3d 836, 840 (2d Cir. 1997) (quoting *Quirama v. Michele*, 983 F.2d 12, 14 (2d Cir. 1993)).

A criminal conviction in state court will not be reversed if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also Policano v. Herbert*, 507 F.3d 111, 115-16 (2d Cir. 2007) (stating that "[i]n a challenge to a state criminal conviction brought under 28 U.S.C. § 2254 . . . the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt" (quoting *Jackson*, 443 U.S. at 324)); *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002) ("[W]e review the evidence in the light most favorable to the State and the applicant is entitled to habeas corpus relief only if no rational trier of fact could find proof of guilt beyond a reasonable doubt based on the evidence adduced at trial."). A criminal conviction will stand so long as "a reasonable mind 'might fairly conclude guilt beyond a reasonable doubt.'" *United States v. Strauss*, 999 F.2d 692, 696 (2d Cir. 1993) (quoting *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir. 1984). Even when "faced with a record of historical facts that supports conflicting inferences [a court] must presume – even if it does not affirmatively appear in the record – that the trier of fact resolves any such conflicts in favor of the prosecution, and must defer to that resolution." *Wheel v. Robinson*, 34 F.3d 60, 66 (2d Cir. 1994) (quoting *Jackson*, 443 U.S. at 326).

A habeas petitioner cannot prevail on a claim of legally insufficient evidence unless he can show that, viewing the evidence in the light most favorable to the prosecution, "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Flowers v. Fisher*, 296 F. App'x 208, 210 (2d Cir. 2008) (quoting *Jackson*, 433 U.S. at 324). When considering the sufficiency of the evidence of a state conviction, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999).

### 2. Application

Petitioner argues that the prosecution failed to prove his guilt beyond a reasonable doubt. However, upon review of the record, it is clear that the prosecution presented sufficient evidence from which a rational trier of fact could conclude that petitioner was guilty beyond a reasonable doubt.

First, while testifying, Mercer read petitioner's confession to the jury. Second, the crime lab supervisor testified that a forensic scientist from his lab determined that the blood stained baseball cap had petitioner's DNA on the sweatband area. Third, the jurors heard testimony from Glover, a friend of petitioner, who petitioner spoke to about the robbery, assault, and murder. Additionally, the jurors heard testimony from Santalis, petitioner's girlfriend and mother of his children, regarding petitioner's role in the robbery,

assault, and murder. Moreover, jurors heard consistent testimony from Arbaiza, Dudley, Ventura, and Mercer regarding the relative heights and skin tones of petitioner, Bryson, and Brewster. This testimony provided additional support, in combination with the other evidence, for a jury to conclude that petitioner was the intruder who stabbed Carter and Arbaiza. This overwhelming evidence easily could have led a rational jury to conclude beyond a reasonable doubt that petitioner committed second degree murder under a felony murder theory, first degree assault, and two counts of first degree burglary.

## B. Ineffective Assistance of Counsel Claim

Petitioner has not set forth the basis for his ineffective assistance of counsel claim in his petition. Respondent argues that petitioner's claim of ineffective assistance of counsel must be denied because habeas corpus jurisprudence requires *pro se* habeas petitioners to provide more than a mere conclusory assertion of a claim for ineffective assistance of counsel. (Resp. Br. at 3-4.) Respondent states that, in the instant petition, petitioner merely wrote the issue ineffective assistance of counsel in his petition without providing any factual assertions to support his claim. (*Id.* at 4.)

In an abundance of caution, the Court interprets the petition to assert the same claims asserted by petitioner with respect to ineffective assistance of counsel that were raised in his direct appeal in state court. (Deft.-Appellant Br. at 4, 20, 37, 40.) Thus, petitioner contends that he received ineffective assistance of counsel because counsel failed to: (1) object to the testimony of Galdi regarding DNA analysis conducted in the crime lab by Baumann and failed to cross-examine Galdi; (2) view the crime scene videotape prior to trial; (3) give an adequate summation; and (4) make a timely

missing witness jury charge request regarding Stephan. Respondent argues that petitioner's claim fails on its merits because petitioner was provided with meaningful representation. For the reasons set forth below, this Court finds that petitioner's claim of ineffective assistance of counsel is without merit.

### 1. Legal Standard

Under the standard promulgated in *Strickland v. Washington*, 466 U.S. 668 (1984), a defendant is required to demonstrate two elements in order to state a successful claim for ineffective assistance of counsel: that (1) "counsel's representation fell below an objective standard of reasonableness," *id.* at 680, and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

The first prong requires a showing that counsel's performance was deficient. However, constitutionally effective counsel embraces a "wide range of professionally competent assistance," and "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 690). The performance inquiry examines the reasonableness of counsel's actions under all circumstances, keeping in mind that a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight." *Greiner*, 417 F.3d at 319 (quoting *Rompilla v. Beard*, 545 U.S. 374, 389 (2005)). In assessing performance, a court must apply a "heavy measure of deference to counsel's judgments." *Greiner*, 417 F.3d at 319 (quoting *Strickland*, 466 U.S. at 691). "'A

lawyer's decision not to pursue a defense does not constitute deficient performance if, as is typically the case, the lawyer has a reasonable justification for the decision,'" *DeLuca v. Lord*, 77 F.3d 578, 588 n.3 (2d Cir. 1996), and 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" *Id.* Moreover, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.*

The second prong focuses on prejudice to a petitioner. A petitioner is required to show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "Reasonable probability" means that the errors were of a magnitude such that it "undermine[s] confidence in the outcome." *Pavel v. Hollins*, 261 F.3d 210, 216 (2d Cir. 2001) (quoting *Strickland*, 466 U.S. at 694). "[T]he question to be asked in assessing the prejudice from counsel's errors . . . is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt." *Henry v. Poole*, 409 F.3d 48, 63-64 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 695). "'An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.'" *Lindstadt v. Keane*, 239 F.3d 191, 204 (2d Cir. 2001) (quoting *Strickland*, 466 U.S. at 691). Moreover, "[u]nlike the determination of trial counsel's performance under the first prong of *Strickland*, the determination of prejudice 'may be made with the benefit of hindsight.'" *Hemstreet v. Greiner*, 491 F.3d 84, 91 (2d Cir. 2007) (quoting *Mayo v.*

*Henderson*, 13 F.3d 528, 534 (2d Cir. 1994)).

The Court proceeds to examine petitioner's claim, keeping in mind that the habeas petitioner bears the burden of establishing both deficient performance and prejudice. *United States v. Birkin*, 366 F.3d 95, 100 (2d Cir. 2004).

### 2. Application

#### a. Failure to Object to Galdi's Testimony and Failure to Cross-Examine Galdi

Petitioner alleges that trial counsel was ineffective for failing to object to alleged hearsay evidence. Specially, petitioner finds objectionable his counsel's failure to object to the testimony of Galdi or to cross-examine him.

Here, petitioner's claim fails to satisfy the first prong of *Strickland*. This Court finds that the trial court's admission of the disputed testimony into evidence was proper under New York law at the time, since had an objection been made, the testimony would have been admissible regardless.[14]

---

[14] Petitioner does not raise a Sixth Amendment Confrontation Clause claim with respect to Galdi's testimony regarding the DNA analysis conducted by Baumann. However, subsequent to petitioner's direct appeal, the United States Supreme Court held in *Melendez-Diaz v. Massachusetts* that a criminal defendant has a Sixth Amendment right at trial to "be confronted with" the analysts who had identified certain evidence as cocaine; "certificates of analysis" from the analysts, who did not appear at trial, were insufficient. 557 U.S. 305, 129 S.Ct 2527, 2531-32 (2009); *see also Bullcoming v. New Mexico*, 131 S.Ct 2705, 2710 (2011) (holding defendant has the right to confront laboratory analyst unless analyst was unavailable at trial and defendant had an opportunity pre-trial to cross examine that specific analyst). The rule articulated in *Melendez-Diaz* and *Bullcoming* does not apply retroactively to cases on collateral review. *See, e.g., Louder v. Coleman*, No. 09-1124,

Further, counsel's decision not to object to Galdi's testimony or cross-examine him was a tactical decision left to the discretion of counsel. *See Taylor v. Fischer*, No. 05 Civ. 3034(GEL), 2006 WL 416372, at *5 (S.D.N.Y. Feb. 21, 2006). Given the testimony, counsel could have easily concluded that there was no discernible benefit to cross-examining Galdi.

Nonetheless, even assuming *arguendo* that the trial counsel's performance was constitutionally defective, petitioner's claim would still fail because he has not demonstrated prejudice as required by the second prong of the *Strickland* test. In light of the prosecution's overwhelming evidence against petitioner, the admission of the alleged hearsay testimony at issue did not create a reasonable probability that, but for counsel's failure to object or cross-examine, the trial verdict would have been different. Accordingly, petitioner cannot demonstrate ineffective assistance of counsel due to counsel's failure to object to Galdi's testimony or to cross-examine him.

---

2009 WL 4893193, at *5 (W.D. Pa. Dec. 10, 2009) (order adopting report and recommendation); *Vega v. Walsh*, No. 06-CV-6492(ARR)(JO), 2010 WL 1685819, at *10 (E.D.N.Y. Apr. 22, 2010) (report and recommendation) ("I therefore conclude that *Melendez-Diaz* does not apply retroactively and that the court should reject [petitioner's] Confrontation Clause claim."). In any event, even if petitioner raised such a claim and *Melendez-Diaz* could be applied retroactively on collateral review, any such error would be harmless in this case given the overwhelming evidence discussed *supra* establishing his guilt even apart from the DNA evidence. *See, e.g., United States v. Madarikan*, 356 F. App'x 532, 534 (2d Cir. 2009); *see also Bullcoming*, 131 S.Ct. at 2719 n.11 ("nothing in this opinion impedes a harmless-error inquiry on remand."). Thus, even if petitioner raised such a claim, habeas relief would not be warranted.

b.  Failure to View the Crime Scene Videotape Prior to Trial

There is no evidence in the record to support petitioner's claim that counsel was deficient for failing to view the crime scene videotape prior to trial. Petitioner does not purport to claim what additional arguments counsel could have made based on this videotape. In any event, the trial judge gave counsel an opportunity to view the videotape during trial. Counsel, after viewing the videotape, concluded that there were no objections to raise against its admission into evidence. Counsel's determination not to pursue arguments based on the crime scene videotape was a reasonable conclusion and strategy. Additionally, petitioner sets forth no evidence that there were any factual problems with the videotape that would suggest that that counsel should have investigated it further. As such, petitioner cannot meet the first prong of *Strickland*.

Moreover, even assuming *arguendo* that counsel was somehow deficient, petitioner makes no argument as to how any alleged failures prejudiced him. As discussed *supra*, there was overwhelming evidence of petitioner's guilt on all counts of which he was convicted. There is no reason to believe that, absent the alleged deficiency, the jury would have reached a different conclusion. *See Butts v. Walker*, No. 01 CV 5914(JG), 2003 WL 22670921, at *8 (E.D.N.Y. Nov. 6, 2003). Accordingly, petitioner cannot satisfy the second prong of *Strickland*.

Petitioner's claim that counsel was ineffective for failing to investigate the crime scene videotape prior to trial is without merit.

c.  Failure to Give an Adequate Summation

Williams' petition further requests habeas relief on the ground that counsel

failed to give an adequate summation. In particular, petitioner contends that trial counsel was ineffective for giving a closing statement that consisted of three and one-half pages of trial transcript.

In light of the "heavy measure of deference to counsel's judgments," *Greiner*, 417 F.3d at 319 (internal quotation marks omitted), trial counsel's summation did not "[fall] below an objective standard of reasonableness," *Strickland*, 466 U.S. at 694, such that habeas relief is warranted.

Counsel's summation did not fall below an objective standard of reasonableness. During summation, counsel urged the jury to view the credibility of Santalis and Glover with caution because each testified in an attempt to seek leniency for their own crimes. (*Id.* at 916-17.) Furthermore, counsel also argued that petitioner's confession was a result of physical coercion and that it should be disregarded. (*Id.* at 917-18.) Counsel adequately and succinctly argued to the jury that certain key items of evidence should not be given consideration due to bias or coercion. In light of this record, petitioner has failed to demonstrate that counsel was ineffective with regard to his summation. As such, petitioner cannot meet the first prong of *Strickland*.

Furthermore, even assuming *arguendo* that petitioner was able to prove that trial counsel's summation was inadequate, petitioner cannot show that he was prejudiced by counsel's error. Petitioner has not cited any facts from the record suggesting that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *Strickland*, 466 U.S. at 694, and, accordingly, petitioner's claim for ineffective assistance of trial counsel

relating to counsel's allegedly inadequate summation must fail.

d.  Failure to Make a Timely Missing
       Witness Jury Charge Request

Petitioner claims that habeas relief is appropriate because trial counsel failed to timely request a missing witness charge for Stephan. Petitioner argues that, because Stephan was present during his arrest and initial interview at police headquarters that culminated in his written confession, Stephan should have been called as a witness at trial. Accordingly, petitioner contends that counsel erred in failing to request a missing witness instruction in a timely manner.

Under New York law, a party seeking a missing witness charge must demonstrate, *inter alia*, "that the witness would provide non-cumulative testimony" that would not "merely corroborate the testimony of other witnesses." *Davis v. Mantello*, 42 F. App'x 488, 491 (2d Cir. 2002); *People v. Keen*, 728 N.E.2d 979, 982-83 (N.Y. 2000)). Here, there is no reason to believe that Stephan's testimony would not have been cumulative of that given by Mercer. Both detectives were present during petitioner's arrest and interview, and petitioner has not alleged that Stephan had any knowledge of those events that Mercer did not have.

In light of this record, it is clear that petitioner would not have been entitled to a missing witness charge and, accordingly, counsel was not ineffective for failing to timely request such a charge. *See Davis*, 42 F. App'x at 491-92 (finding trial counsel not ineffective where testifying witness and missing witness were together throughout duration of the crime, and missing witness therefore would have added no new information). As such, petitioner cannot meet the first prong of *Strickland*.

Additionally, even assuming *arguendo* that petitioner was able to prove that trial counsel's decision not to timely request a missing witness charge was outside the range of professional competence, petitioner has not presented any evidence that the result of his trial would have been different had counsel made such a request in a timely manner. As discussed *supra*, the record reveals that there was overwhelming evidence of petitioner's guilt and there is no basis to conclude that a missing witness charge would have changed the outcome of the verdict. Accordingly, petitioner has failed to show either that counsel erred in failing to timely request the missing witness charge or that this alleged error prejudiced petitioner in any way. Thus, habeas relief on this ground is unwarranted.

C. Harsh and Excessive Sentence Claim

Petitioner contends that the sentence imposed on him for the crimes he was convicted of – murder in the second degree, assault in the first degree, and burglary in the first degree – was excessive and, therefore cruel and unusual punishment. The Appellate Division found that petitioner's sentence was not excessive. *People v Williams*, 59 A.D.3d 576 (N.Y. App. Div. 2009). Therefore, AEDPA deference applies. As discussed below, the Court concludes that the Appellate Division's determination that petitioner's sentence was not harsh and excessive was not contrary to, or an unreasonable application of, clearly established federal law.

1. Legal Standard

For the purpose of habeas review, "[no] federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law." *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992); *see also Santiago v. Riley*, CV 92-2302

(DRH), 1993 WL 173625, at *4 (E.D.N.Y. May 14, 1993) ("Where the sentence imposed by a state trial judge is within the statutorily prescribed range, the constitution is not implicated and there is no federal question for habeas corpus review.").

2. Application

In this case, petitioner was convicted of one count of murder in the second degree, one count of assault in the first degree and two counts of burglary in the first degree and was sentenced to (1) an indeterminate term of twenty-five years to life in prison for his conviction of murder in the second degree, (2) a determinate sentence of fifteen years in prison for his conviction of assault in the first degree to run consecutively with the sentence for second degree murder, with a period of five years' post-release supervision, and (3) two determinate sentences of fifteen years in prison for his conviction of two counts of burglary in the first degree to run concurrently with the sentence for first degree assault, with a period of five years' post-release supervision, and the mandatory surcharge of $270.00. (S. at 14-15.)

Murder in the second degree is a class A-I felony. N.Y. Penal Law § 125.25. According to New York Penal Law section 70.00(3)(a)(i), "for a class A-I felony, [the] minimum period [of imprisonment] shall not be less than fifteen years nor more than twenty-five years." N.Y. Penal Law § 70.00(3)(a)(i). The maximum term of imprisonment is life imprisonment. N.Y. Penal Law § 70.00(2)(a). Petitioner received a sentence of twenty-five years to life imprisonment for his conviction of murder in the second degree.

Assault in the first degree and burglary in the first degree are class B felonies. N.Y. Penal Law §§ 120.10, 140.30(2). According

to New York Penal Law section 70.02(3)(a), "[f]or a class B felony, the term [of imprisonment] must be at least five years and must not exceed twenty-five years . . . ." N.Y. Penal Law § 70.02(3)(a). Petitioner received a sentence of fifteen years' imprisonment for his conviction of assault in the first degree and two sentences of fifteen years for his conviction of two counts of burglary in the first degree.

Petitioner was sentenced within the ranges prescribed by the aforementioned sections of the New York Penal Law. Therefore, since petitioner's sentence was within the statutorily prescribed range, there is no federal question for habeas review.[15] Accordingly, petitioner's application for habeas corpus relief on this ground is denied.

\*       \*       \*

In sum, after carefully reviewing the merits of all of petitioner's claims, the Court concludes that the state court's decisions on his claims were not contrary to, nor an unreasonable application of, clearly established federal law, nor were they based on an unreasonable determination of the facts in light of the evidence presented in state court, and all of the claims are without merit.

IV. CONCLUSION

For the reasons set forth herein, the Court finds that the petitioner has demonstrated no basis for habeas relief

---

[15] In any event, even if the Court could review the sentence within the range prescribed by state law, the Court would find no basis to conclude that petitioner's sentence was grossly disproportionate to the crime committed so as to violate the Eighth Amendment given the nature of the criminal activity that was the subject of the conviction in the instant case.

under 28 U.S.C. § 2254. All of petitioner's claims are plainly without merit. Therefore, the petition for a writ of habeas corpus is denied. Because petitioner has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue. *See* 28 U.S.C. § 2253(c)(2). The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: July 17, 2012
        Central Islip, New York

\*   \*   \*

Petitioner is proceeding *pro se*. Respondent is represented by Thomas Spota, District Attorney of Suffolk County, by Michael Herman Blakely, 200 Center Drive, Riverhead, NY 11901.